**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**JULIO MELECIO,**                                :

                              **Petitioner**       :          **CIVIL ACTION NO. 3:20-2068**

                                                   :          **(JUDGE MANNION)**

                    **v.**                         :

**MICHAEL ZAKEN,**                                 :

                    **Respondents**        :

**<u>MEMORANDUM</u>**

Petitioner Julio Melecio, an inmate confined in the Greene State Correctional Institution, Waynesburg, Pennsylvania, filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. Melecio challenges his conviction and sentence imposed by the Court of Common Pleas of York County, Pennsylvania. For the reasons set forth below, the Court will deny Melecio's petition.

I.    <u>B<small>ACKGROUND</small></u>

The procedural and factual background underlying Melecio's conviction and sentence are adopted from the October 10, 2018 Memorandum Opinion of the Pennsylvania Superior Court, affirming Petitioner's judgment of sentence, and is as follows:

The trial court summarized the facts of the crimes as follows:

At trial, [M.O. ("Victim")] testified that she used to be in a sexual relationship with Appellant. [Victim] testified that on August 31,

2015, she found Appellant had shown up at her house uninvited. Transcript of Trial, 9/12/2017 at 94-95. [Victim] testified that Appellant accused her of seeing someone else and called her a "whore" and a "bitch." Id. [Victim] testified that Appellant was poking her and calling her a slut. Id. at 96. [Victim] testified that Appellant punched her in the face. Id. [Victim] testified that Appellant pushed her down and took her phone. Id. at 97.

[Victim] testified that Appellant slapped her, poked her, and choked her for a few seconds. Id. at 99. [Victim] testified that at that point, she decided to submit to whatever "he says and it'll be over, or it'll be less confrontation." Id. at 158.

[Victim] testified that Appellant yanked her arm and told her not to leave the couch. Id. at 100. [Victim] testified that Appellant allowed her to go to the kitchen, but that Appellant then choked her with his hands again and pushed her to the kitchen floor. Id. at 101. [Victim] testified that Appellant stated that he wanted to have sex with her one last time.  Id. at 102. [Victim] testified that Appellant made her take her underwear off and proceeded to shave her pubic hair. Id. at 102. [Victim] testified that afterwards, Appellant pulled her into the bedroom and made her take off the rest of her clothes. Id. at 103.

[Victim] testified that Appellant made her lay on the bed before he got on top [of] her and "stuck his penis inside" of her vagina. Id. [Victim] testified that she told Appellant to stop and that he was hurting her. Id. at 104. [Victim] testified that she yelled loudly so that her neighbor would hear. Id.

[Victim] testified that afterwards, Appellant straddled her chest and forced his penis into her mouth. Id. [Victim] testified that she was not able to move her arms. Id. at 105.

[Victim] testified that Appellant told her to bend over and then put his penis inside her anus. Id. at 106. [Victim] testified that she was in pain and continued to tell Appellant to stop. Id. [Victim] testified that later, it hurt to sit down. Id. at 114. [Victim]

testified that she had vaginal pain and that her face hurt. Id. at 124. [Victim] testified that she thought Appellant could kill her. Id. at 158.

Trial Court Opinion, 3/22/18, at 3–5.

The trial court summarized the procedural history as follows:

On October 8, 2015, the criminal complaint was filed against Appellant and an arrest warrant was issued. On November 30, 2015, the arrest warrant was withdrawn, and a fugitive warrant was issued in its place. On February 24, 2016, Appellant was arrested.

On August 11, 2016, Appellant filed a continuance for the upcoming trial, which was scheduled for the September 2016 trial term. Appellant's continuance was granted, and the new date was scheduled to be October 31, 2016, the start date for the November 2016 trial term.

On May 8, 2017, Appellant filed a continuance, which was granted, and the trial was rescheduled for the July 2017 trial term. The Commonwealth did not call the case until August 21, 2017 when it filed for a "trial date certain" in the 2017 September trial term.  On August 28, 2017, the trial court scheduled the trial for September 12, 2017.

On September 12, 2017, Honorable Harry M. Ness ("trial court") denied Appellant's Motion to Dismiss pursuant to Rule 600[1] and the case proceeded to trial the same day.

On December 20, 2017, Appellant was sentenced, in total, to 30–60 years imprisonment after being found guilty by a jury of 1

---

[1] Appellant filed a Motion to Dismiss Pursuant to Pa.R.Crim.P. 600 on September 11, 2017, and the Commonwealth filed its response that same day.

count of rape and 2 counts of involuntary deviate sexual intercourse.[2] On January 3, 2018, the trial court denied Appellant's Post-Sentence Motions.

Trial Court Opinion, 3/22/18, at 1–2. Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issue on appeal:

Whether the Commonwealth violated Rule 600 where there were 399 days of delay in bringing [Appellant] to trial that can neither be excluded nor excused.

Appellant's Brief at 4.

(Doc. 14-1 at 562, Commonwealth v. Melecio, No. 210 MDA 2018, 200 A.3d 550, 2018 WL 4907681 (Pa. Super. 20018) (unpublished memorandum)). Melecio did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

On January 7, 2019, Melecio filed a Post-Conviction Relief Act (PCRA) petition pursuant to 42 PA. CONS. STAT. §9541 *et seq.*, and a subsequent counseled amended petition. (Doc. 14-1 at 613 PCRA Court Opinion). The two issues presented for review were whether Attorney Rader was ineffective for failing to introduce as evidence, two letters the victim

---

[2] 18 Pa.C.S. §§3121(a)(1) and 3123(a)(1), respectively.

- 4 -

wrote to Plaintiff while he was incarcerated and whether Attorney Rader was ineffective for failing to call Dr. Rotolo as a witness to rebut the testimony of Nurse O'Brien. Id. Following a hearing on June 4, 2019, Melecio's PCRA petition was denied. Id.

Melecio filed an appeal to the Superior Court raising the following sole claim for review:

> Whether the [PCRA c]ourt's denial of [Melecio's] Petition for [p]ost-[c]onviction [c]ollateral [r]elief and failure to find [that trial] counsel was ineffective was an abuse of discretion[,] where trial counsel failed to introduce into evidence the testimony and/or repo[r]t of Dr. Suzanne Rotolo[,] which noted discrepancies and issues with the ["SAFE"][3] exam conducted on the victim[,] and said evidence would have encountered the [testimony of] the expert witness, [SAFE] nurse Pattie O'Brien, [who was] called by the Commonwealth?

Commonwealth v. Melecio, 11-1 MDA 2019, 227 A.3d 379, 2020 WL 526018 (Pa. Super. 2020) (unpublished memorandum). By Memorandum Opinion dated February 3, 2020, the Superior Court affirmed the denial of Melecio's PCRA petition. Id.

Melecio then filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 in which he raises the following three issues

---

[3] "SAFE" is an acronym for "Sexual Assault Forensic Examiner." See N.T., 9/12/17, at 182.

of ineffective assistance of counsel:

1.  Trial counsel was ineffective for failing to call an expert witness, Dr. Rotolo, and failing to admit an expert opinion that contradicted the Commonwealth's expert.

2.  Trial counsel and PCRA counsel were ineffective for failing to retain letters the victim sent Petitioner, while he was incarcerated, that "corroborated [Petitioner's] trial testimony that the sex was consensual, and that alleged victim lied for revenge.

3.  PCRA counsel was ineffective for failing to procure and present exculpatory witness Jordan Owens, who could have testified that the victim lied about the rape allegation for revenge and that she had done this before to another man.

(Doc. 7 at 2).

## II.  Legal Standards of Review

A habeas corpus petition pursuant to 28 U.S.C. §2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973). 28 U.S.C. §2254, provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States

....

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254. Section 2254 sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. Cullen v. Pinholster, 563 U.S. 170, 181 (2011); Glenn v. Wynder, 743 F.3d 402, 406 (3d Cir. 2014). A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). This limitation places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings resulted in "a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." Reed v. Farley, 512 U.S. 339, 348 (1994) (citations omitted).

- 7 -

Melecio's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA").

## III.  Discussion

### A. Exhaustion and Procedural Default

Before considering the merits of Melecio's grounds for relief, the Court must address Respondent's contention that two of Petitioner's three grounds for relief are unexhausted and procedurally defaulted. Specifically, Respondent asserts that Petitioner's second and third grounds raised are unexhausted and procedurally defaulted.  (Doc. 14 at 18-22).

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus, unless the petitioner has first satisfied the exhaustion requirement articulated in 28 U.S.C. §2254(b). Specifically, habeas relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1)(A); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional

challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000); Picard v. Connor, 404 U.S. 270, 275–76 (1971). The habeas statute codifies this principle by requiring that a petitioner exhaust the remedies available in the courts of the State, 28 U.S.C. §2254(b)(1)(A), meaning a state prisoner must "fairly present" his claims in "one complete round of the state's established appellate review process," before bringing them in federal court. O'Sullivan, 526 U.S. at 845 (stating "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process."); see also Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard, 404 U.S. at 275 (1971); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). This requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts. Picard, 404 U.S. at 278; see also McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (holding that petitioner must present both "factual and legal substance" of claim to state courts). Mere reliance of state and federal claims on the same constitutional provision

does not render the two claims substantially equivalent. See Brown v. Cuyler, 669 F.2d 155 (3d Cir. 1982); Zicarelli v. Gray, 543 F.2d 466 (3d Cir. 1976). Both the legal theory and the facts on which a federal claim rests must have been presented to the state courts. See Picard, 404 U.S. at 277; Brown, 669 F.2d at 158–61. "When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. §2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default. See Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)." McCandless, 172 F.3d at 260. To demonstrate "cause" for a procedural default, a petitioner must point to some objective external factor which impeded his efforts to comply with the state's procedural rule.  See Murray v. Carrier, 477 U.S. 478, 488 (1986). "Prejudice" will be satisfied only if he can demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of

a violation of federal law. See Lockhart v. Fretwell, 506 U.S. 364, 366 (1993).

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," Murray, 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998); Murray, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. Hubbard v. Pinchak, 378 F.3d 333, 339-40 (3d Cir. 2004).

It is Respondent's position that Petitioner's claims that trial counsel was ineffective for failing to admit and cross-examine the victim regarding letters she sent Defendant post-incident indicating they were still in a

relationship; and PCRA counsel was ineffective for failing to procure and present exculpatory witness Jordan Owens are not exhausted and are procedurally defaulted. (Doc. 14). Petitioner argues that he can overcome the procedural default of these claims under the authority of Martinez v. Ryan, 566 U.S. 1 (2010). (Doc. 7).

Martinez v. Ryan, 566 U.S. 1 (2010), recognized a "narrow exception" to the general rule that attorney errors in collateral proceedings do not establish cause to excuse a procedural default. Specifically, Martinez holds that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Id. at  9. To successfully invoke the Martinez exception, a petitioner must satisfy two factors: that the underlying, otherwise defaulted, claim of ineffective assistance of trial counsel is "substantial," meaning that it has "some merit," id. at 14; and that petitioner had "no counsel" or "ineffective" counsel during the initial phase of the state collateral review proceeding. Id. at 17; see also Glenn v. Wynder, 743 F.3d 402, 410 (3d Cir. 2014).

A petitioner demonstrates that the underlying ineffective assistance of trial counsel claim has "some" merit by "show[ing] that reasonable jurists

could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Workman v. Superintendent Albion SCI, 915 F.3d 928, 937-38 (3d Cir. 2019); see also Martinez, 566 U.S. at 13-14. A petitioner demonstrates that post-conviction counsel's ineffectiveness caused the procedural default by showing that post-conviction counsel's performance was deficient under the first prong of the Strickland v. Washington, 466 U.S. 668 (1984) standard. See Preston v. Sup't Graterford, SCI, 902 F.3d 365, 376 (3d Cir. 2018); see also Workman, 915 F.3d at 937–38. Satisfaction of the first Strickland prong requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. Strickland, 466 U.S. at 688. We will first address Respondent's argument concerning the exhaustion and procedural default of Petitioner's second and third claims.

    i.   **Claim Two**

In Claim Two, Petitioner states that "trial counsel was ineffective for failing to admit and cross examine alleged victim regarding letters she sent

to Defendant after the incident while the Defendant was incarcerated, alleging that she still loved Defendant and that she "plays for keeps." (Doc. 7 at 11). Specifically, Petitioner claims that there are two letters, "dated 3/17/16 and 3/21/16", which were "written by the victim to [Petitioner] after the incident, while [he] was incarcerated," and state the following:

> I love you so much that I can't stop thinking about you. . . I feel so bad for what your (sic) going through, you know I always told you that when I love, I go hard when I'm in a relationship, I'm playing for keeps and I told you that several times. I want to marry you, you are so special. . . you are my soul-mate.

(Doc. 7 at 11). The other letter states:

> I still love you and I still miss you and I want to say I'm very sorry for everything that you are going through. Baby, I want us so bad, that's what I want.

Id.

Petitioner raised this issue in his PCRA petition, where it was addressed at his PCRA hearing as follows:

**BY ATTORNEY ACCARDI:**

Q:  All right. Now, the first issue that we had raised regarding the ineffective assistance of counsel was you stated you had received letters from the victim while you were incarcerated, correct?

A:  Yes, sir.

Q:   Okay. And these were – can you explain that a little bit more? When did you receive these letters?

A:   I was arrested on February 23rd, 2016. On March 21st, I received two letters from Melinda Marie Owens with nine pictures, five in one envelope and four in another envelope.

Q:   Mr. Melecio, just going to backtrack a little bit. You were arrested on February what?

A:   23rd, 2016, sir.

Q:   And that was for the crimes in this case, correct?

A:   yes, sir.

Q:   Okay. And then you claim you got the letters from Melinda on March 1st of the same  year?

A:   No, March 21st, sir.

Q:   of 2016?

A:   Yes, sir.

Q:   And how many letters were there?

A:   Two.

Q:   And there were pictures with the letters?

A:   Nine photos, five in one envelope and four in the other envelope, sir.

Q:   And did you provide those photos and/or letters to Attorney Rader?

A:     Yes, sir.

Q:     And why did you provide them to him?

A:     To show them to the jury at trial, sir.

Q:     And what were the nature of the letters, Mr. Melecio?

A:     Melinda had written saying that she missed me, that she loves me, that she apologizes, she's sorry, that she didn't know it was a serious crime, what she had did, it was false allegations on behalf that I had caught her cheating with another individual in the house.

Q:     Now, do you have copies of these letters today?

A:     There was an attorney named Ms. Leticia C. Chavez. She had an office here in York County. Now she moved to Harrisburg, and she got all my documents. She had contacted Mr. Brian McNeil, the one that had did my appeal. They send all my papers back to Albion but I been down here at York County Prison, so they sent them back to Ms. Leticia.

Q:     Mr. Melecio, do you have any copies in your possession at SCI Albion or here in York County?

A:     Leticia got all my original stuff in Harrisburg.

Q:     To be more specific, do you have copes of those two letters from Melinda that you received of the photos on March 21st of 2016?

A:     No. Ms. Leticia C. Chavez have all my documents, sir.

Q:     But you did give copies to Mr. Rader?

A:     I gave the original ones to Mr. Rader, sir.

Q:     And did you discuss those with Mr. Rader?

A:     Yes, sir. I also have a letter right there within my documents right here in the courtroom of Mr. Brian McNeil, the individual that had did my appeal, written me a letter that they found in the Public Defender's Office in my file in my folder another letter from Ms. Melinda Mare Owens.

Q:     When you had the discussion with Mr. Rader regarding the originals, when you gave it to him, what did you discuss?

A:     I had told him that he could show this to prove that this lady, this Melinda Marie Owens, is stating false allegations against me, and et cetera, et cetera. And he said, I got you, but on behalf that I written two complaints to the disciplinary board in Harrisburg, he retaliated and just disappear all my documents, all my evidence, and et cetera.

Q:     Those letters were never introduced at trial, correct?

A:     No, sir.

Q:     Did you ever ask him why they weren't?

A:     On behalf - - I'm thinking that he's there too assist me as a Public Defender, and he railroad me, sir, like betrayed me on behalf of retaliation of two complaints that I have copies within my papers right there on my desk.

Q:     Mr. Melecio, I'm trying to help the Court understand what happened before trial and leading up to it. So you gave him the letters. He said he was going to use them a trial. Is that what you're testifying today?

A:     Yes, sir.

Q:   Okay. And then you get to trial and they weren't used?

A:   They were never used.

Q:   Did you ask him specifically during trial what happened to the letters, where are they, why aren't you using them, anything like that?

A:   His statement was, they're irrelevant.

Q:   And why do you think those letters would have been valuable during trial? What purpose do you think they would have served?

A:   I believe that on behalf if I was accused of raping my wife, my ex-wife, why she would write me a letter after I was arrested saying, I'm sorry, I love you, you're the best man I ever had, I'm going to get you a lawyer. She even tried to come see me in York County. She put phone time, like minutes on the phone, for me to call her.

     And then in May, there was another letter that was received by York County Prison, and it was intercepted, and it was faxed to the District Attorney's Office too. And, like, to my memory, I was arrested February 23rd of 2016, and when Mr. James B. Rader came to visit me to bring my discovery August 9th, 2016, within my discovery, it was the copy of the letter of the victim from May also.

Q:   May of 2016?

A:   Yes, sir. All I told him was three letters, two in March 21st of 2016 and then another letter in May. The one in May was within my discovery that it was intercepted with York County Prison and given to the District Attorney's Officer, sir.

Q:     Mr. Melecio, is there anything else regarding the letters from the victim that you want the Court to know that I've not yet asked you about?

A:     That's really it, sir.

(Doc. 14-1 at 580-585, N.T. PCRA Hearing, 6/4/19, at 6-11). In response to Petitioner's testimony regarding the letters, Petitioner's trial counsel testified as follows:

Q:     First, regarding the photos and letters that he referenced from the victim which he stated had been given to him or mailed to him at the prison on March 21st, 2016, do you recall any such letters?

A:     I do.

Q:     Okay. Do you recall letters from that date and time?

A:     Not specifically, no.

Q:     Okay. Do you recall discussing with him any letters he received while he was in prison for the charges that he was later convicted of?

A:     I recall discussing - - reviewing those letters that he had produced. I don't recall those letters detailing or specifically mentioning that they were written after his arrest on these charges. I know he was in prison on some previous matters, and there may have been some not necessarily confusion, but lack of specificity as to whether those letters were written before or after. So that's where the relevance issue was.

Q:     So, if Mr. Melecio had provided you with letters from a prior incarceration written by the victim, would you have wanted to admit those at trial?

A:     Not in this case because it was known. It was a matter of fact that they were in a relationship. They had been in a prior relationship. The issue in this trial was that it came down to consent during this incident.

Q:     Do you recall any photos that were produced?

A:     I don't recall photos being produced.

Q:     If you had been provided with letters and/or photos that you could determine were sent to the Defendant while he was incarcerated for the rape charge from the victim, would you have wanted to these at trial?

A:     If it was clear that she was still communicating with him and showed some affection for him after this alleged sexual assault, I certainly would have tried to use those letters to confront her credibility, but I could not, from my recollection, I could not establish when those letters were produced.

Q:     Attorney Rader, did you recall any specific conversations with Mr. Melecio regarding - - did you ask for those letters in any form?

A:     I think I did.

Q:     Okay. And did he ever provide them to you?

A:     Whether -- normally my procedure is when someone gives me letters, I ask for permission whether I can make copies, if they want to hold onto the originals, because sometimes there's a little mistrust between the attorney/client sometimes in these types of cases. Again, I wasn't asked

to bring these letters, produce these letters. If there are copies, they should be in the Public Defender's file. They should be in our case management system. My procedure, my standard operating procedure is to scan any documents into the file, and we had that capability back in 2017.

Q:   And just to be clear, Attorney Rader, you acknowledged receiving some letters, but the time frame of those letters was unclear. Is that accurate?

A:   Right. That's my recollection.

Q:   And you never did receive any letter from what you can remember from Mr. Melecio that you could readily determine that they were from the period of time he was incarcerated for the rape charge from the victim?

A:   Correct. The letters that I remember reviewing, again, established that they had a relationship at one time that was somewhat happy, was a positive type of relationship.

The other concern was that if I tried to introduce these letters, that I perhaps could open up the door that he was currently serving another sentence for an unrelated matter. And, again, establishing the relevance of these letters was sort of tenuous. From my recollection, there's nothing in the letters that was a recantation or that she was taking back what she was asserting. She certainly testified forthrightly at trial under oath.

Q:   And, Attorney Rader, you wouldn't have destroyed any letters that would have been sent that the Defendant would have provided you, correct?

A:   No.

(Doc. 14-1 at 590-593, N.T. PCRA Hearing, 6/4/19, at 16-19). In closing, the

Court generated one final question for Attorney Rader:

> **THE COURT:**     Attorney Rader, just a brief question here. The letters, to the extent you had any recollection regarding these letters, would you have used them if, as the Defendant asserts, there was statements in there, I'm sorry, I falsely accused you, I didn't know it was such a serious case?
>
> **THE WITNESS:** I certainly hope so. If there was that quasi-recantation or actually recantation, I would have gone after her. But I don't recall – there was just discussions of their relationship and her wanting to get together with him when he gets released from his prior incarceration and her affections for him at that point, but I don't recall any information in the letters where she was saying I falsely accused Mr. Melecio.
>
> \*\*\*\*\*
>
> **THE COURT:**  I presided over this trial. I recall it factually the same way that Attorney Rader recalls the trial with respect to the nature and extent of his cross-examination of Nurse O'Brien. Obviously, the only thing I don't know is what is in the text of these letters, and Mr. Melecio indicates these letters were a recantation. At least that was his testimony. Attorney Rader has no specific recollection. However, professionally, and he was a well-known, well-respected defense attorney, boy I ought to have picked up on that, and I'm pretty confident he would have picked upon on that.
>
> So, I'm satisfied that there's no basis for a PCRA in this case. I'm satisfied that it's a matter of credibility, and the credibility in this case I'll weigh on behalf of Attorney Rader. I think he made strategic decisions throughout the course of the trial.
>
> The only evidence that's missing is these letters that he claims somehow exonerate him, but I don't know why we don't have them here today. We don't have them because they don't exist,

or I doubt Attorney Rader destroyed them as part of some grand conspiracy to railroad a Defendant. I don't belief that. But there's a named individual according to your client who has them. I'll give  you 10 days to find them and supplement the record if that's what you want to do. Otherwise, I'm going to dismiss the petition.

**ATTORNEY ACCARDIE:**  I'd appreciate the additional time, your Honor. I will put on the record that from my examination of the Public Defender's file, which they did promptly provide me after I requested it, I did find some letters. However, they were not during the time period that is in question. They were from previous incarcerations.

**THE COURT:**  Consistent with Attorney Rader.

**ATTORNEY ACCARDI:**  Exactly.

**THE COURT:**  If you find something different from this other attorney, by all means, get it to me, at which point, I'll change my opinion in this case, but I'm going to deny the PCRA relief at this point.

(Doc. 14-1 at 601-604, N.T. PCRA Hearing, 6/4/19, at 27-30).

As is apparent from Petitioner's PCRA hearing, although Petitioner's trial counsel did not recall letters specifically from March 17 or March 21, 2016, he recalled other letters that established that Petitioner and the victim had a relationship at one time that was somewhat happy. His concern with introducing these letters was that they could open up the door that he was currently serving another sentence for an unrelated matter, as well as that the relevance of these letters was sort of tenuous. Additionally, the letters

he did recall did not contain a recantation or that the victim was taking back what she was asserting. Finally, trial counsel testified that if the March 17 and March 21, 2016 letters did exist and were presented to him, he definitely would have used them to discredit the victim. However, the issue of their existence hung in the balance. As such, the Court provided Petitioner, and his PCRA counsel, additional time to pursue the existence of the March 17, and March 21, 2016 letters, secure them and supplement the record with them. Apparently, the letters were never discovered, or never existed, as the record reveals no further discussion of the March, 2016 letters. This is supported by the fact that PCRA counsel abandoned the issue of the letters on appeal and raised only one, unrelated issue, for appeal. (see Doc. 14-1 at 607, Concise Statement of Matters Complained of an Appeal). To the extent that Petitioner now seeks to rely on Martinez, to overcome his procedural default of this issue by arguing that "PCRA counsel was ineffective in failing to develop this issue of [Petitioner's] trial counsel's ineffectiveness," his claim fails.

In Martinez, the Supreme Court announced a narrow, but significant, exception to this rule. In relevant part, it held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel

be raised for the first time in a collateral proceeding, a petitioner may overcome the default of a claim of trial counsel's ineffectiveness if the petitioner demonstrates: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial" and (2) PCRA counsel was ineffective within the meaning of Strickland v. Washington, 466 U.S. 668 (1984) for (3) failing to raise that claim in the "initial review collateral proceeding." Martinez, 566 U.S. at 17.

The Supreme Court in Martinez defined "initial-review collateral proceeding" as a collateral proceeding that provides the first occasion to raise a claim of trial counsel's ineffective assistance. Id. at 9. In Pennsylvania, that is the proceeding before the PCRA court. The Supreme Court's decision in Martinez was influenced by the fact that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." Id. at 10. The Supreme Court held that because this concern is not present in "appeals from initial-review collateral proceedings," a petitioner may not use attorney error in a collateral appeal as cause to excuse a procedural default. Id. at 16 (emphasis added); Norris v. Brooks, 794 F.3d 401, 404-05 (3d Cir. 2015)

(explaining that Martinez "applies only to attorney error causing procedural default during initial-review collateral proceedings, not collateral appeals").

Because this claim was litigated before the PCRA court, i.e., in the relevant "initial-review collateral proceeding," the exception announced in Martinez is inapplicable. PCRA counsel's failure to pursue it on appeal cannot establish "cause" to avoid default of the claim. Martinez, 566 U.S. at 16; Norris, 794 F.3d at 404-05.

This claim is procedurally defaulted, and Petitioner presents no basis upon which this Court can excuse his procedural default.

### ii.   Claim Three

Petitioner's third claim states that "PCRA counsel was ineffective for failing to investigate, procure and present exculpatory newly discovered witness Jordan Owens, who had testimony the alleged victim lied and that this is not the first time she has done this." (Doc. 7 at 12).  Specifically, Plaintiff claims that he "directed [his] PCRA counsel, Mr. Accardi, to contact this witness and call him to my PCRA hearing to present his testimony, however counsel never investigated or called this witness to offer this testimony at [his] hearing." Id. Petitioner concludes that "as a result, [he] has been denied [his] rights under the 5th and 6th Amendment of the U.S. Const.

under the 'Due Process' clause and 'right to effective assistance of counsel,' and [he] request[s] relief in the form of an evidentiary hearing in accordance with the precedent of Martinez v. Ryan, 132 S.Ct. 1309 (2012) that affords [him] a right to effective assistance of PCRA counsel." Id. Petitioner's claim is without merit.

Petitioner had no right to counsel at his PCRA hearing under the Constitution or the AEDPA. See Werts v. Vaughn, 228 F.3d 178, 189 n.4 (3d Cir. 2000); 28 U.S.C. §2254(i). The Supreme Court of the United States has barred habeas relief for ineffective assistance of counsel during collateral post-conviction proceedings. Martinez v. Ryan, 566 U.S. 1, 17 (2012) (citing § 2254(i)). While §2254(i) prohibits a claim based directly on counsel's ineffectiveness in a collateral proceeding, Martinez permits a petitioner to show that ineffectiveness of counsel in the collateral proceeding ("PCRA counsel") was the cause of a procedurally defaulted ineffective assistance claim against trial counsel. Id. at 14.

Here, Petitioner does not claim that his PCRA counsel created a procedural default for any ineffective assistance of counsel claim. Rather, he argues that PCRA counsel was ineffective for failing to investigate, procure and present exculpatory newly discovered witness Jordan Owens.

In failing to connect the alleged ineffectiveness to a claim of ineffective trial counsel, Petitioner has made only a claim of PCRA counsel's ineffectiveness, and Martinez is inapplicable. Because Petitioner's standalone ineffectiveness of PCRA counsel claim is not cognizable as a basis for habeas relief, habeas review will be denied on this claim.

### B. Merits

Petitioner raises one ineffective assistance of counsel claim that has been fully exhausted.

In Strickland v. Washington, 466 U.S. 668, 687-88 (1984), the Supreme Court articulated a two-prong test in assessing whether a petitioner has been denied the effective assistance of counsel. A petitioner must demonstrate: (1) that his counsel's representation "fell below an objective standard of reasonableness" and (2) that such defective performance caused the petitioner prejudice. See id.

In evaluating the first prong of the Strickland test, the court must be "highly deferential" toward counsel's conduct. Id. at 689. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Id. ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is

all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). "Strickland and its progeny make clear that counsel's strategic choices will not be second-guessed by post-hoc determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 446 U.S. at 689). Notably, courts will not deem counsel ineffective for failing to raise a meritless argument. Strickland, 466 U.S. at 691; United States v. Saunders, 165 F.3d 248, 253 (3d Cir. 1999).

To satisfy the prejudice prong, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Moreover, the petitioner must show that he or she had a reasonable likelihood of prevailing on the motion at issue, and having prevailed on the motion, it was also reasonably likely that the result of the trial would have been different. See Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005).

To prevail on a claim for ineffective assistance of counsel, a petitioner must satisfy both prongs of the Strickland test. Carpenter v. Vaughn, 296 F.3d 138, 149 (3d Cir. 2002). The inquiry may begin with either the deficient performance or prejudice prong, and the court is not required to consider the second prong of the test if the petitioner is unable to satisfy the first one. Strickland, 466 U.S. at 697.

### Claim One

Petitioner's Claim One is that "trial counsel was ineffective for failing to call expert witness Dr. Rotolo and admit expert opinion that contradicted Commonwealth's expert's determination of victim's examination that she was raped, where Dr. Rotolo noted alternative explanations for exam results that included negligence on part of examiner and also that some parts of report were false." (Doc. 7 at 8).

Petitioner raised this issue in his PCRA petition, with the PCRA court finding the following:

> In analyzing an ineffective assistance claim, it is presumed that counsel is effective and working in the client's best interest, and it is the defendant's burden to prove otherwise. Commonwealth v. Hancharik, 633 A.2d 1074, 1079 (Pa. 1993). To obtain relief on an ineffective assistance claim, a defendant must establish by a preponderance of the evidence that:

(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. Commonwealth v. Reed, 971 A.2d 1216, 1221 (Pa. 2009).

The petitioner must show "that counsel's performance was deficient and that such deficiencies prejudiced the petitioner." Commonwealth v. Tedford, 960 A.2d 1, 12 (Pa. 2008) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987). Prejudice is established when a defendant shows "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). Significantly, the Pennsylvania Supreme Court has held that, "[i]f a reasonable basis exists for the particular course chosen by counsel, the inquiry ends and counsel's performance is deemed constitutionally effective." Commonwealth v. Abdul-Salaam, 808 A.3d 558, 561 (Pa. 2001)(citing Commonwealth v. Derk, 719 A.2d 262, 266 (Pa. 1998). We now turn to Appellant's allegation.

Appellant contends that Attorney Rader was ineffective for failing to call Dr. Rotolo as a witness to rebut the testimony from Commonwealth's witness, Nurse O'Brien. At the PCRA hearing Attorney Rader addressed his decision to not call Dr. Rotolo as a witness. Attorney Rader testified that he did not call Dr. Rotolo because during cross examination he was able to get Nurse O'Brien to concede that the injuries that [the victim] sustained could have been sustained during consensual sex. Additionally, Dr. Rotolo aided Attorney Rader in determining what questions to ask Nurse O' Brien during cross examination. Having Dr. Rotolo testify would have just been duplicative testimony.

Appellant did not suffer prejudice as a result of Attorney Rader's decision to not call Dr. Rotolo. First, Nurse O'Brien conceded

that there was no definitive way to determine whether or not the injuries that [Victim] presented with were sustained during consensual or non-consensual sex; Dr. Rotolo would have testified to the same. Second, as a witness for the defendant it is likely that the jury would find that Dr. Rotolo lacked credibility. Had Attorney Rader called Dr. Rotolo as a witness it is unlikely that the results of the proceeding would have been different.

As the underlying claim has no arguable merit, a reasonable basis existed for Attorney Rader's actions, and it is unlikely that the outcome of the proceeding would have been different had Dr. Rotolo testified. Attorney Rader was not ineffective as counsel for Appellant.

(Doc. 14-1 at 615-617). The Superior Court, in adopting the PCRA Court's

denial of the claim, first set forth the appropriate standard of review:

To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove, by a preponderance of the evidence, that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. §9543(a)(2)(ii). Specifically,

[t]o be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. Commonwealth v. Chmiel, … 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from Commonwealth v. Pierce, … 527 A.2d 973, 975-76 (Pa. 1987)). Counsel is presumed to have rendered effective assistance. Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must establish all

the Pierce prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

Commonwealth v. Treiber, 121 A.3d 435, 445 (Pa. 2015) (footnote and some citations omitted).

Relating to the reasonable basis prong, generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. Courts should not deem counsel's strategy or tactic unreasonable unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

Commonwealth v. Durrett King, 195 A.3d 255, 259 (Pa. Super. 2018) (quotation marks, brackets and citations omitted).

Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant. The mere failure to obtain an expert rebuttal witness is not ineffectiveness. [The a]ppellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause. Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony that was presented by the

> prosecution. Thus, the question becomes whether or not defense counsel effectively cross-examined the Commonwealth's expert witness.

Chmiel, 30 A.3d at 1143 (citations, quotation marks and brackets omitted; emphasis added).

> It is undisputed that Dr. Rotolo was able and willing to testify at Melecio's trial. Therefore, our inquiry is limited to whether trial counsel effectively cross-examined the Commonwealth's expert witness. See id., supra.

(Doc. 14-1 at 650-652).

After going through the extensive cross-examination of Nurse O'Brien,

(see Doc. 14-1 at 652-660), the Superior Court found the following:

> Here, Attorney Rader elicited testimony from O'Brien that she could not determine, based on the nature of the victim's bruises, whether (1) the sexual contact was non-consensual, and (2) the bruising resulted from Melecio's sexual contact with the victim. Therefore, we conclude that Attorney Rader effectively cross-examined O'Brien regarding the information to which Melecio claims Dr. Rotolo would have testified, and Dr. Rotolo's purported testimony would not have furthered Melecio's case. See Chmiel, supra. Accordingly, Attorney Rader was not ineffective in deciding to not call Dr. Rotolo as a witness, and the PCRA court properly denied Melecio's PCRA Petition.

(Doc. 14-1 at 660).

In this case, the state courts' analysis is wholly justified under Strickland. Trial counsel's decision to refrain from calling Dr. Rotolo as an expert witness reflected sound strategic judgment in the factual context of

this case. The United States Court of Appeals for the Third Circuit has held that the precise choice made here, to forego calling certain witnesses, is an appropriate tactical decision that does not entitle a petitioner to habeas corpus relief on the grounds of ineffective assistance of counsel. Alexander v. Shannon, 163 F. App'x 167, 175 (3d Cir. 2006). See also Sanders v. Trickey, 875 F.2d 205, 212 (8th Cir. 1989) (trial counsel's failure to call a witness "is precisely the sort of strategic trial decision that Strickland protects from second-guessing"). The state courts' determination that counsel's performance was not deficient is not an unreasonable application of Strickland. Thus, Melecio is not entitled to federal habeas relief on this claim.

## IV.     **Certificate of Appealability**

"Under the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), a 'circuit justice or judge' may issue a COA [certificate of appealability] only if the petitioner 'has made a substantial showing of the denial of a constitutional right.'" Tomlin v. Britton, 448 Fed.Appx. 224, 227 (3d Cir. 2011) (citing 28 U.S.C. §2253(c)). "Where a district court has rejected the constitutional claims on the merits, ... the petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

For the reasons set forth herein, Petitioner has not made a substantial showing of the denial of a constitutional right or that jurists of reason would find it debatable that Court's assessment of the claims debatable or wrong. Accordingly, a COA will not issue.

## V.   <u>Conclusion</u>

For the reasons set forth above, the Court will deny the petition for writ of habeas corpus. A separate order shall issue.

<div align="center" style="margin-left:50%">

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

</div>

**Dated: June 22, 2023**
20-2068-01

<div align="center">- 36 -</div>